# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, | Case No. 3:18-cv-2078-MGL |
| Plaintiff, | |
| v. | |
| EUNICE MEDINA, in her official capacity as DIRECTOR OF THE SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendant. | |

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff, by and through its attorneys, brings this First Amended and Supplemental Complaint against the above-named Defendant and her employees, agents, delegates, and successors in office, in her official capacity, and in support thereof state the following:

**INTRODUCTION**

1.     For more than 40 years, Plaintiff Planned Parenthood South Atlantic ("Planned Parenthood") and its predecessor organizations have provided critically needed primary care, preventive care, and family planning services to patients in South Carolina, where poor health outcomes are far too common and health care providers are scarce—particularly providers who, like Planned Parenthood, accept Medicaid. Planned Parenthood provides high-quality and compassionate health care—including physical exams, cancer screenings, contraceptive visits, pregnancy testing and counseling, and STI testing and treatment—to every patient that walks through the doors of its Charleston and Columbia health centers, regardless of income, race,

gender, sexual orientation, or insurance status.  In a state where low Medicaid reimbursement rates deter many health care providers from accepting or participating fully in Medicaid, many of Planned Parenthood's patients rely on it for almost all of their health care needs.

2.      Although Planned Parenthood offers abortion as permitted by South Carolina law—that is, only in the earliest weeks of pregnancy, with extremely limited exceptions—it offers many other health care services as well.  And Planned Parenthood does not receive Medicaid reimbursement for abortions in South Carolina.  Nevertheless, South Carolina has used Planned Parenthood's provision of abortion, which it does separate and apart from the Medicaid program and in compliance with state law, as justification to terminate Planned Parenthood's federal and state funding and to strip it of the ability to provide basic, preventive health care to patients who use Medicaid to pay for their care.

3.      Specifically, in 2017 and 2018, Governor McMaster issued two Executive Orders directing the state to rescind funding from abortion providers, which resulted in the South Carolina Department of Health and Human Services ("DHHS") immediately terminating Planned Parenthood from the state's Medicaid program on July 13, 2018 (the "Executive Actions").

4.      Planned Parenthood and then-co-Plaintiff Julie Edwards filed the instant action challenging the termination as a violation of the Medicaid Act and Planned Parenthood's Fourteenth Amendment rights.  This Court enjoined the termination, and for years, this case has worked its way through the appellate process.

5.      Meanwhile, the state legislature has attempted to use the power of the purse to target Planned Parenthood—going so far as to single it out by name for unfavorable treatment.  Between 2019 and 2025, the South Carolina General Assembly passed a series of appropriations bills specifying that "once the federal injunction [in this case] is lifted, [DHHS] may not direct any

federal funds to Planned Parenthood" (the "Defunding Legislation," and together with the Executive Actions, the "Defunding Actions").

6.     Governor McMaster has made no secret of his single-minded focus on excluding Planned Parenthood **specifically** from South Carolina's Medicaid program solely because Planned Parenthood also provides abortion, stating that he will use any tool at his disposal to punish Planned Parenthood until it is "gone."  That the Executive Orders do not identify Planned Parenthood by name, instead referring to "abortion clinics" as defined by S.C. Code Ann. § 44-41-75 and "affiliated physicians or professional medical practices," is nothing more than a thinly veiled attempt to disguise the true purpose of these acts.  While some South Carolina hospitals both receive Medicaid reimbursement and perform abortions in exceptional circumstances, Planned Parenthood operates the state's only "abortion clinics" that also receive Medicaid reimbursement for non-abortion services.  Accordingly, Planned Parenthood is the *only* health care provider at risk of being terminated from Medicaid as a result of the Executive Actions.  The South Carolina legislature, too, has said the quiet part out loud—repeatedly—through its passage of the appropriations bills that terminate federal funding for "Planned Parenthood."

7.     Planned Parenthood's provision of abortion is legal—indeed, South Carolina permits abortion until detection of a so-called "fetal heartbeat" and in extremely limited circumstances thereafter, *see* S.C. Code Ann. § 44-41-610 *et seq.*—but in any event, this case is not about the legality or constitutionality of abortion.  Rather, this case is about Planned Parenthood's provision of essential health care services, **other than abortion**, to its patients in South Carolina.  Absent relief, terminating Planned Parenthood from Medicaid will have a devastating impact on its ability to provide a wide range of non-abortion health care, including primary care, preventive care, and family planning services, to the hundreds of Medicaid patients

who visit its health centers each year. Planned Parenthood will be forced to turn away these patients. It would suffer immediate, irreparable harm to its mission, reputation, and established relationships with patients. Planned Parenthood's patients too will suffer irreparable harm: Many of the patients it turns away will be left with no alternative provider or may forgo care. And even if other providers theoretically are available, they often do not provide the same services, in the same accessible and timely manner, as Planned Parenthood. This is the reason so many patients choose Planned Parenthood for their health care—because finding high-quality, accommodating, and compassionate health care providers is exceedingly difficult in the South Carolina communities where Planned Parenthood's patients reside. As the Fourth Circuit held in affirming this Court's order enjoining Planned Parenthood's termination from Medicaid, if Planned Parenthood is defunded, patients are likely to suffer irreparable harm through "diminished access to high-quality health care suited to [their] needs." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 690, 707 (4th Cir. 2019) ("*Baker II*").

8.    Following the Supreme Court's reversal on the narrow ground that an individual Medicaid beneficiary cannot maintain a Section 1983 suit to enforce the Free Choice of Provider provision of the Medicaid Act, *see Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2239 (2025), Planned Parenthood brings this amended and supplemental complaint seeking declaratory and injunctive relief to protect its ability to provide—and its patients' access to—Medicaid-eligible health care services in South Carolina.

9.    The State's targeted efforts to terminate Planned Parenthood from Medicaid are unconstitutional. The Defunding Actions impermissibly treat Planned Parenthood differently than other Medicaid providers—even though Planned Parenthood provides abortion entirely outside the Medicaid program and does not receive Medicaid reimbursement for abortions—without adequate

justification, in violation of the Equal Protection Clause of the Fourteenth Amendment. The Defunding Legislation, which identifies by name and denies federal funding to "Planned Parenthood," also amounts to an unconstitutional bill of attainder that inflicts punishment on Planned Parenthood without a judicial trial. Finally, Defendant failed to provide Planned Parenthood with proper notice or sufficient opportunity for a hearing prior to terminating it from South Carolina's Medicaid program, in violation of Planned Parenthood's due process rights under the Fourteenth Amendment. And while the Defunding Legislation doubles down on the Executive Actions' targeted attack on Planned Parenthood, the Executive Actions and Defunding Legislation are each an independent threat to Planned Parenthood and its patients who rely on Medicaid, and each must be enjoined to prevent Planned Parenthood's termination from the state Medicaid program. Accordingly, the Executive Actions and Defunding Legislation both should be declared unconstitutional, and preliminarily and permanently enjoined.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

11.     Planned Parenthood's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

12.     Venue in this judicial district is proper under 28 U.S.C. § 1391.

13.     Planned Parenthood's claims are timely. The applicable statutes of limitations were tolled during the pendency of the permanent injunction pursuant to S.C. Code Ann. § 15-3-100. Planned Parenthood timely preserved administrative appeal rights pursuant to S.C. Code Ann. § 1-23-150.

## THE PARTIES

### I.     Plaintiff Planned Parenthood South Atlantic

14.     Planned Parenthood is a 501(c)(3) not-for-profit corporation.  For over four decades, Planned Parenthood and its predecessors have provided high-quality, compassionate, affordable health care and education to South Carolina residents, including Medicaid recipients, regardless of income, race, gender, sexual orientation, or insurance status.  Planned Parenthood operates two health centers in South Carolina: one in Charleston and one in Columbia.  Planned Parenthood employs more than 25 staff members at these locations.

15.     Planned Parenthood is a Medicaid-enrolled provider.  It provides health care to patients in South Carolina who rely on Medicaid for health insurance and seeks reimbursement through Medicaid for the provision of eligible health care services.

16.     Planned Parenthood offers its patients, including patients insured through Medicaid, a range of primary care, preventive care, and family planning services.  This includes screening for a host of illnesses, including diabetes, depression, anemia, high cholesterol, thyroid disorders, high blood pressure, and cancer (including breast, cervical, testicular, and prostate cancers); screening and treatment for sexually transmitted infections ("STIs"), including human papillomavirus ("HPV"), HIV/AIDS, and Hepatitis B; HPV vaccinations; pregnancy testing and counseling; contraception (including long-acting reversible contraceptives or "LARCs") and contraceptive counseling; menopause treatment; vasectomies; and annual exams.  Planned Parenthood uses evidence-based practices and highly trained staff to provide high-quality, reliable medical care.  Its health centers in South Carolina also offer same-day and walk-in appointments, in-person and telehealth options, and interpretation services.

17.     In 2024, Planned Parenthood provided over 480 health care visits for over 380

Medicaid patients in South Carolina, a more than 25% increase in Medicaid patients seen annually compared to 2017, reflecting the significant and growing needs of the community.

18.     In addition to the many other health care services it provides, Planned Parenthood offers abortion to the extremely limited extent allowed by South Carolina and federal law.  Planned Parenthood's health centers are licensed as "abortion clinic[s]" as defined by South Carolina law.  *See* S.C. Code Ann. §§ 44-41-75(A), 44-41-10(e).  Planned Parenthood does not receive Medicaid reimbursement for abortions in South Carolina.

19.      Planned Parenthood South Atlantic is a separately incorporated, independently operated member of the national organization Planned Parenthood Federation of America ("PPFA").  PPFA is a national membership organization with 47 independently operated member organizations, each of which is an independent 501(c)(3) non-profit organization.  PPFA licenses the use of the "Planned Parenthood" name and trademark to Planned Parenthood South Atlantic.  PPFA does not exercise control over Planned Parenthood South Atlantic, and Planned Parenthood South Atlantic has its own chief executive officer, board of directors, staff, books, and operations.  Planned Parenthood South Atlantic is the only PPFA member located in South Carolina.

**II.     Defendant**

19.     Eunice Medina is Director of the South Carolina Department of Health and Human Services.  Defendant Medina is sued in her official capacity, as are her employees, agents, and successors in office.

## BACKGROUND

**I.     South Carolina's Participation in Medicaid**

20.     The Medicaid program, established under Title XIX of the Social Security Act of 1935, 42 U.S.C. § 1396 *et seq.*, provides health care coverage for eligible families and individuals

with low incomes.  It does so through joint federal-state partnerships pursuant to which the federal government provides financial assistance to participating states to help them furnish care to individuals in need.  A state may elect whether or not to participate in Medicaid.  If it chooses to participate, it must comply with a range of federal statutes and regulations, including requirements imposed by the Medicaid statute and by the Secretary of the U.S. Department of Health and Human Services.  *See generally* 42 U.S.C. § 1396a(a)(1)–(89).

21.     South Carolina opts to participate in Medicaid, administering a state program called "Healthy Connections."  As of April 2025, South Carolina's Medicaid program provides coverage to almost 1 million South Carolinians (approximately 17% of the state's population).[1]  In fiscal year 2023, total Medicaid spending in South Carolina was $8.9 billion.[2]  The federal government paid 75.4% of these costs, with South Carolina paying the remaining 24.6% (approximately $2.2 billion).[3]

22.     South Carolina's Medicaid program covers a range of health care services for eligible individuals, such as doctor's office visits and prescription medications.  As required by federal law, South Carolina's Medicaid program also covers family planning services, which encompasses a range of health care services that enable individuals to make informed decisions

---

[1] *Medicaid and CHIP Monthly Enrollment*, Kaiser Fam. Found., https://www.kff.org/medicaid/state-indicator/medicaid-and-chip-monthly-enrollment/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Medicaid%20Enrollment%22,%22sort%22:%22asc%22%7D (last visited August 20, 2025).
[2] *Total Medicaid Spending*, Kaiser Fam. Found., https://www.kff.org/medicaid/state-indicator/total-medicaid-spending/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited August 20, 2025).
[3] *Federal and State Share of Medicaid Spending*, Kaiser Fam. Found., https://www.kff.org/medicaid/state-indicator/federalstate-share-of-spending/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited August 20, 2025).

about their reproductive health.  *See* 42 U.S.C. § 1396d(a)(4)(C); 42 CFR 441.20.  The federal government reimburses South Carolina for 90% of expenditures attributable to offering, arranging, and furnishing family planning services and supplies through Medicaid.  42 U.S.C. § 1396b(a)(5).

23.     To be eligible for Medicaid-covered family planning services, an individual must have an annual income of less than $30,361.40, and less than $62,371.00 for a family of four.  For non-family planning services, individuals sometimes must meet even stricter requirements, including both income limitations and work requirements.[4]

24.     Federal law requires states to ensure that patients insured through Medicaid can use Medicaid to pay for medical services from any willing provider who is qualified to provide those services.  42 U.S.C. § 1396a(a)(23)(A) ("[A]ny individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services.").  Planned Parenthood is both willing and qualified to provide health care services to Medicaid patients, as it has done for years.  For many Medicaid patients, Planned Parenthood is their provider of choice for that care.

25.     Under the Hyde Amendment, federal Medicaid funds *do not* cover abortions except in certain extremely narrow circumstances.  Pub. L. No. 115-141, div. H, tit. V, § 506–507 (2018).

26.     Furthermore, South Carolina law prohibits "[s]tate funds appropriated for family planning" from being "used to pay for an abortion."  S.C. Code Ann. § 43-5-1185.

**II.     Planned Parenthood Provides Critical Health Care Services to South Carolina Residents, Including Those Insured Through Medicaid.**

27.     There is a significant need in South Carolina for the public health care services

---

[4] *Program Eligibility and Income Limits*, S.C. Dep't of Health & Hum. Servs. (2025), https://www.scdhhs.gov/income-limits.

Planned Parenthood provides. The state ranks 43rd in overall health outcomes, solidly in the bottom quintile of the nation.[5] Six in ten South Carolinian adults suffer from a chronic disease, and four in ten suffer from multiple chronic diseases, one of the highest rates in the country.[6] South Carolina faces high, and rising, rates for various STIs, including syphilis and HIV/AIDS, particularly among teenagers.[7]

28.    South Carolina's poverty rate is higher than the national average. In 2023, almost 32% of South Carolina residents had incomes below 200% of the Federal Poverty Line, compared with approximately 28% nationally.[8] Because South Carolina restricts its Medicaid program to only the most vulnerable categories of its population, individuals who are eligible for full Medicaid coverage in South Carolina are sicker and poorer than the general low-income population, with a correspondingly greater need for access to medical services.[9]

29.    For women in South Carolina, public health care is a matter of life and death. South Carolina faces a maternal and child health crisis, consistently ranking among the worst states in

---

[5] *Health Outcomes in South Carolina*, United Health Found.: Am. Health Rankings (2024), https://www.americashealthrankings.org/explore/measures/Outcomes/SC.

[6] *Chronic Diseases in South Carolina*, S.C. Dep't of Health & Env't Control (Jan. 2024), https://dph.sc.gov/sites/scdph/files/Library/CR-012864.pdf.

[7] Patrick McCreless, *2 SC Cities Face Rising STD Rates, Among Highest in US for 2025, Study Shows. See the Full List*, The State (Apr. 2, 2025), https://www.thestate.com/news/state/south-carolina/article302675484.html; Ian Kayanja, *South Carolina Ranks Fourth in National STD Rates, According to Latest CDC Data*, ABC 15 News (Sept. 30, 2023), https://wpde.com/news/local/south-carolina-ranks-fourth-in-national-std-rates-according-to-latest-cdc-data-health-charleston-wciv-2023; Hanna Schatteman, *Columbia Ranks No. 3 in US for STD Rates, New Study Says*, Carolina News & Rep. (Apr 12, 2023), https://carolinanewsandreporter.cic.sc.edu/columbia-ranks-no-3-in-us-for-std-rates-new-study-says/.

[8] *Distribution of the Total Population by Federal Poverty Level*, Kaiser Fam. Found., https://www.kff.org/state-health-policy-data/state-indicator/population-up-to-200-fpl/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited August 20, 2025).

[9] Brief of 7 South Carolina Healthcare Policy Experts, Advocates, and Providers as Amici Curiae in Support of Respondents, *Medina*, 145 S. Ct. 2219 (23-1275).

the nation on key indicators: it ranks 8th highest in maternal mortality, 7th highest in pre-term birth rate, and 11th highest in infant mortality.[10]  In 2021, the state recorded 47.2 pregnancy-related deaths per 100,000 live births, 88.9% of which were determined to be preventable.  Many women in South Carolina must travel long distances to reach birthing hospitals, which greatly increases their risk of pregnancy complications.[11]  Given this need, Medicaid—the largest source of public funding for family planning services—is critical.[12]  Approximately 60% of births in South Carolina are covered by the state's Medicaid program.[13]  63% of Medicaid recipients in South Carolina are women, and 20% of all women of reproductive age in South Carolina are enrolled in Medicaid.[14]

30.    Health care is substantially costlier for women than men, and nearly 17% of women in South Carolina live below the federal poverty level.[15]  In South Carolina, the number of women at risk of experiencing time poverty, or time constraints leaving an individual little to no time to tend to their own well-being, is high, since women "are the sole, primary, or co-breadwinners in

---

[10] S.C. Inst. of Med. & Pub. Health, *Improving Maternal and Infant Health:  Increasing Access to Care in Rural South Carolina* 9, 12 (Apr. 2025), https://imph.org/wp-content/uploads/Maternal-and-Infant-Health-Report-2025.pdf.

[11] Live Healthy S.C., *South Carolina State Health Assessment* 64 (Dec. 2023), https://dph.sc.gov/sites/scdph/files/media/document/New%20PDFs/SHA-Report-20240521.pdf.

[12] Guttmacher Inst., *Public Funding for Family Planning and Abortion Services, FY 1980-2015* (Apr. 2017) https://www.guttmacher.org/report/public-funding-family-planning-abortion-services-fy-1980-2015.

[13] S.C. Dep't of Health & Hum. Servs., *SCDHHS Receives Grant to Invest in Maternal Health Care* (January 8, 2025), https://www.scdhhs.gov/communications/scdhhs-receives-grant-invest-maternal-health-care#:~:text=Through%20the%20grant%2C%20CMS%20will,for%20those%20enrolled%20in%20Medicaid.

[14] Amy Friedrich-Karnik, *Policy Analysis: What's at Stake in Medina v. Planned Parenthood South Atlantic*, Guttmacher Inst. (Mar. 26, 2025), https://www.guttmacher.org/2025/03/whats-stake-medina-v-planned-parenthood-south-atlantic.

[15] *Poverty - Women in South Carolina*, United Health Found.: Am. Health Rankings, https://www.americashealthrankings.org/explore/measures/poverty_women/SC (last visited Aug. 19, 2025).

[more than 70%] of families."[16]  Further, the shortage of women's healthcare providers is acute, with 14 counties lacking even a single practicing OB-GYN physician, and five other counties having just one.[17]  From 2018 to 2021, 65% of pregnancy-related deaths in South Carolina occurred among individuals enrolled in the state's Medicaid program.[18]

31.     Women and children of color often bear the largest burden of the health deficits observed across the state.  Black South Carolinians are more likely to suffer from underlying chronic health conditions, such as diabetes, which 19.1% of Black adults reported having compared to 11.4% of white adults.  In 2021, 47.9% of Black South Carolinians reported having high blood pressure, compared to 36.6% of white South Carolinians.[19]  Moreover, the maternal mortality rate in South Carolina is 2.4 times higher for Black women and other women of color as compared to white women.[20]  There is a significant racial disparity in low-birth-weight infants.[21]

---

[16] *Fast Facts: Economic Security for Women and Families in South Carolina*, Ctr. for Am. Progress (Oct. 19, 2018), https://www.americanprogress.org/article/fast-facts-economic-security-women-families-south-carolina/.

[17] S.C. Off. for Healthcare Workforce, *South Carolina Health Professions Data Book* 154 (2021), https://www.americanprogress.org/article/fast-facts-economic-security-women-families-south-carolina/.

[18] S.C. Maternal Morbidity & Mortality Rev. Comm., *2025 Legislative Brief* 4 (Feb. 2025), https://www.scstatehouse.gov/reports/DeptofPublicHealth/SCMMMRC%20Legislative%20Report%202025.pdf.

[19] S.C. Dep't of Pub. Health, *State of the Heart for African Americans* (Oct. 2024), https://dph.sc.gov/sites/scdph/files/Library/00103-ENG-CR.pdf.

[20] Julia Tindall, *Black Maternal Healthcare Experiences in South Carolina*, Soc'y for Soc. Work & Rsch. (Jan. 17, 2025), https://sswr.confex.com/sswr/2025/webprogram/Paper57685.html#:~:text=The%20United%20States%20(US)%20has,racism%20on%20maternal%20health%20outcomes.

[21] *Birthweight Data for South Carolina*, March of Dimes (Jan. 2024), https://www.marchofdimes.org/peristats/data?reg=45&top=4&stop=42&lev=1&slev=4&obj=3&sreg=45; *A Profile of Prematurity in South Carolina*, March of Dimes (2025), https://www.marchofdimes.org/peristats/reports/south-carolina/prematurity-profile; S.C. Dep't of Pub. Health & Env't Control, S.C. Community Assessment Network (SCAN), Infant Mortality Tables, https://apps.dhec.sc.gov/Health/scan/scan/mch/infantmortality/input.aspx (last visited Aug. 19, 2025).

Importantly, due in part to historic and systemic discrimination in social, economic, and health care systems, women and children of color in South Carolina also are disproportionately likely to rely on Medicaid for health insurance.[22]  58% of individuals enrolled in South Carolina's Medicaid program identify as non-white.  Between 2021 and 2023, the percentage of pregnant individuals on Medicaid at time of birth was highest for Black individuals at 69.1%, followed by American Indian/Alaska Native individuals at 67.2%, white individuals at 37.3%, and Asian/Pacific Islander individuals at 30.2%.[23]

32.     South Carolina also faces a pressing shortage of health care providers to address the needs of its population.  This is in part because South Carolina ranks among the lowest in spending per Medicaid beneficiary of any state.[24]  Low Medicaid reimbursement rates deter many healthcare providers from accepting or participating fully in the state's Medicaid program.  South Carolina has a physician-to-patient ratio 23% worse than the national average.[25]  Medicaid participants are disproportionately likely to live in medically underserved areas, meaning physician shortages disproportionately reduce their access to care.  Combined with the fact that South Carolina's population has higher rates of health problems as compared to the national

---

[22] *Medicaid Efforts to Address Racial Health Disparities*, Kaiser Fam. Found. (July 1, 2024), https://www.kff.org/medicaid/issue-brief/medicaid-efforts-to-address-racial-health-disparities/.
[23] Friedric-Karnik, *supra* note 14; *Health Insurance/Income Data for South Carolina*, March of Dimes, https://www.marchofdimes.org/peristats/data?reg=99&top=11&stop=652&lev=1&slev=4&obj=1&sreg=45 (last visited Aug. 19, 2025).
[24] Medicaid & CHIP Payment & Access Comm'n, *Medicaid Benefit Spending Per Full-Year Equivalent Enrollee by State and Eligibility Group* (2024), https://www.macpac.gov/publication/medicaid-benefit-spending-per-full-year-equivalent-fye-enrollee-by-state-and-eligibility-group/.
[25] Brief of 7 South Carolina Healthcare Policy Experts, *supra* note 9, at 12.

average,[26] this makes it critical for the state to maintain the fullest possible network of providers to ensure patients get the care they need.

33.    Planned Parenthood plays an important role in this provider network.  Many Medicaid recipients rely on Planned Parenthood to meet virtually all of their health care needs, including a wide range of primary, preventive, and family planning health care services like screening for chronic illnesses and cancers, prenatal and postpartum services, and annual exams. In 2024 alone, Planned Parenthood provided over 480 health care visits for over 380 individuals insured through Medicaid.  Planned Parenthood provides nearly 4,000 people annually in South Carolina with breast and cervical cancer screenings, pregnancy testing, family planning services, and other preventive care, including vaccinations.

34.    Planned Parenthood provides services in areas and in ways that uniquely meet the needs of South Carolina residents.  30% of the population of South Carolina lives in U.S. Department of Health and Human Services-designated Primary Care Health Professional Shortage Areas ("HPSAs")—areas in which primary care professionals are practically inaccessible.[27] Medicaid participants are disproportionately likely to live in these areas.  Planned Parenthood's health center in Columbia is located in a Primary Care HPSA, with its low-income community designated as an HPSA population group, indicating a shortage of providers specifically for that population.[28]  For patients in many South Carolina communities, Planned Parenthood is not only their provider of choice, but potentially the only source of critical health care that meets their

---

[26] *Key Data on Health and Health Coverage in South Carolina*, Kaiser Fam. Found. (Feb. 10, 2016), https://www.kff.org/disparities-policy/factsheet/key-data-on-health-and-health-coverage-in-south-carolina/.
[27] *Primary Care Health Professional Shortage Areas*, Kaiser Fam. Found. (Dec. 31, 2024), https://www.kff.org/other/state-indicator/primary-care-health-professional-shortage-areas-hpsas/.
[28] *Health Professional Shortage Area (HPSA) HPSA Detail—Primary Care*, Health Res. & Servs. Admin., https://data.hrsa.gov/tools/shortage-area/by-address (last visited July 22, 2025).

needs.

35.    Even if other providers theoretically were available, Medicaid patients in South Carolina often choose to receive health care from Planned Parenthood based on a number of factors unique to Planned Parenthood.  With its specialization in family planning, evidence-based practices, and highly trained staff, Planned Parenthood is known as a provider of high-quality, reliable medical care.  Planned Parenthood also uniquely engenders trust given its well-earned reputation as a provider of compassionate, non-judgmental, culturally sensitive care.  Medicaid patients in particular may feel judged by other providers because of their socioeconomic status. Planned Parenthood demonstrates through both words and action that all of its patients are important and equally deserving of empathy and attention.

36.    Sexual and reproductive health in particular can be highly sensitive for patients, some of whom may find it difficult to discuss their concerns or seek treatment for conditions, such as STIs.  Many patients specifically turn to Planned Parenthood for sexual and reproductive health care because of Planned Parenthood's expertise, and out of concerns of privacy violations and stigmatization by other providers.[29]  Planned Parenthood also devotes time and resources to patient education, including on how to use contraception effectively and how to avoid, detect, and treat STIs.

37.    Many patients with low incomes have unique scheduling constraints because they are juggling inflexible work schedules, childcare responsibilities, and transportation challenges. To ensure that these patients have access to health care, Planned Parenthood offers walk-in and

---

[29] *See* Maayan Schechter, *Sexually Transmitted Diseases Up in SC. Agency Wants Almost $1 Million to Cut Cases*, The State (Jan. 26, 2018), https://www.thestate.com/news/politics-government/politics-columns-blogs/the-buzz/article196625184.html (acting Health and Environmental Control director Dave Wilson noting that patients often avoid seeking STI-related care from their primary care provider).

same-day appointments. It also offers telehealth appointments, including for contraceptives, including emergency contraceptives; STI testing and treatment; and HIV services. This flexible scheduling approach is why PPFA member health centers across the country offer appointments approximately 2.5 times more quickly on average than other publicly funded family planning clinics. In South Carolina, this approach allows Planned Parenthood to provide time-sensitive care to patients whom another provider might schedule for an appointment months into the future. Planned Parenthood also offers same-day birth control shots, birth control implants, and intrauterine devices ("IUDs"), meaning patients only need to make one trip to a health center to obtain their contraceptive method of choice.

38.    Planned Parenthood makes interpretation services available to non-English speaking patients at all times, removing a significant barrier to health care access for residents with no or low English proficiency.

## III.    The State's Targeted Efforts to Punish Planned Parenthood

### a.    Executive Orders and Agency Action to Terminate Planned Parenthood from Medicaid

39.    While Governor McMaster has suggested the purpose of the Executive Orders was to prevent government funds from paying for abortions, South Carolina law already ensures that no Medicaid reimbursement in the state is spent on abortions. Indeed, South Carolina law prohibits "[s]tate funds appropriated for family planning" from being "used to pay for an abortion." S.C. § 43-5-1185. Planned Parenthood fully complies with this law.

40.    Medicaid reimbursement for non-abortion health care services does not indirectly pay for abortions either. Medicaid is an insurance program and reimburses medical providers on a fee-for-service basis for specific services that are covered by the program. Medicaid reimbursements provided to Planned Parenthood are for specific family planning, cancer

screening, and other services that have already been rendered.  These reimbursements are the same

amounts that all Medicaid providers receive for those services.  And Medicaid reimbursement rates

are especially low in South Carolina,[30] and do not fully cover the cost of the Medicaid services

Planned Parenthood provides.  Medicaid reimbursements therefore could not possibly subsidize

the abortions performed by Planned Parenthood.

    41.    Despite the lack of connection between public funds and abortion services provided

by Planned Parenthood, Governor McMaster has repeatedly targeted Planned Parenthood's public

health care services for termination solely because Planned Parenthood offers abortions, which it

does outside of the Medicaid program.   Indeed, Governor McMaster publicly has asserted

"confiden[ce] in [his] authority to terminate funding for Planned Parenthood"[31] and has vowed to

"continue to be a threat" until Planned Parenthood is "gone."[32]

    42.    On August 24, 2017, Governor McMaster issued Executive Order 2017-15, aimed

at "abortion providers [that] may be subsidized by State or local funds intended for other women's

health or family planning services, whether such non-abortion services are rendered directly by

abortion providers or by affiliated physicians or professional medical practices."  The Executive

Order directed DHHS to:

> take any and all necessary actions, as detailed herein and to the extent permitted to
> law, to cease providing State or local funds, whether via grant, contract, state
> administered federal funds, or any other form, to any physician or professional
> medical practice affiliated with an abortion clinic and operating concurrently with

---

[30] Medicaid & CHIP Payment & Access Comm'n, *supra* note 24.

[31] *Governor McMaster Files Amicus Brief in* Medina v. Planned Parenthood *in Defense of Life and State Sovereignty*, Off. of Governor Henry McMaster (Feb. 10, 2025), https://governor.sc.gov/news/2025-02/governor-mcmaster-files-amicus-brief-medina-v-planned-parenthood-defense-life-and.

[32] Tim Smith, *Gov. Henry McMaster Says He Would Reject $34 Million in Federal Aid to Stop Abortion, Greenville News* (May 29, 2018), https://www.greenvilleonline.com/story/news/local/south-carolina/2018/05/29/gov-henrymcmaster-says-he-would-reject-federal-aid-stop-abortion/651245002/.

and in the same physical, geographic location or footprint as an abortion clinic.

S.C. Exec. Order No. 2017-15 (Aug. 24, 2017).

43.     DHHS subsequently sought from the Centers for Medicare and Medicaid Services ("CMS") the requisite waivers to permit the exclusion of abortion clinics from its state Medicaid program.

44.     On July 5, 2018, because CMS had not yet approved those waivers to permit South Carolina to exclude Planned Parenthood from Medicaid, and "to prevent taxpayer dollars from directly or indirectly subsidizing abortion providers like Planned Parenthood," Governor McMaster vetoed over $15 million in family planning funding from the state budget.  Although none of those family planning funds would have paid for abortions, and only a small portion was directed to Planned Parenthood (for the provision of non-abortion services), Governor McMaster stated that he would "veto" "Planned Parenthood using taxpayer money for abortions" "every chance [he] gets."[33]  Governor McMaster emphasized that he had "stated many times [he] [was] opposed to what Planned Parenthood is doing" and that the veto was "the most direct way" of stopping Planned Parenthood.[34]

45.     A week later, on July 13, 2018, Governor McMaster issued Executive Order 2018-21, directing DHHS to "expend funds for the purpose of operating" "family planning services," but to "deem" abortion clinics and any affiliated physicians "unqualified," and to "immediately terminate them [from South Carolina's Medicaid program] upon due notice and deny any future

---

[33] Thomas Leavy, *South Carolina Governor Vetoes $15.7 Million From Budget Over Funding for Abortion Providers*, CBS News (July 8, 2018), https://www.cbsnews.com/news/south-carolina-governor-henry-mcmaster-vetoes-15-7-million-from-budget-over-funding-for-planned-parenthood-abortion-providers/.

[34] *GOP Governor Cuts $16 Million From Budget to Take Anti-Abortion Stand*, NBC News (July 9, 2018), https://www.nbcnews.com/health/womens-health/gop-governor-cuts-16-million-health-care-budget-take-anti-n889846.

such provider enrollment applications for the same." S.C. Exec. Order No. 2018-21 (July 13, 2018). The Executive Order further provided that South Carolina "should not contract with abortion clinics for family planning services," while "not deny[ing] South Carolinians access to necessary medical care and important women's health and family planning services" from "other non-governmental entities and governmental agencies."

46. Because Executive Order 2018-21 constituted a "material change" to "the State's operation of the Medicaid program," South Carolina was required to submit a proposed amendment to its contract with CMS prior to any change taking effect. *See* 42 C.F.R. § 430.12(c)(1)(ii). To date, it has failed to do so.

47. Instead, the same day Executive Order 2018-21 was signed, DHHS notified Planned Parenthood that "[t]he Governor's actions result in Planned Parenthood no longer being qualified to provide services to Medicaid beneficiaries" and that it was terminating Planned Parenthood from the state Medicaid program effective immediately. A DHHS spokesperson further told the media that Governor McMaster's actions "result in abortion clinics no longer being qualified to provide family planning services to South Carolina Medicaid beneficiaries."[35]

48. As Defendant knows full well, Planned Parenthood operates the only "abortion clinic[s]" in South Carolina that receive Medicaid reimbursements for non-abortion family planning services that they provide. Accordingly, Planned Parenthood was the *only* health care provider deemed "unqualified" and therefore terminated from Medicaid as a result of the Executive Actions, even though its Medicaid funding has no connection to abortion services.

---

[35] *SC Gov to Medicaid: Cover Medical Care, Not Abortion Clinics*, AP News (July 16, 2018), https://apnews.com/general-news-2180585fb0aa4541b0e09e7b5ee57e55.

**b. This Court Enjoins the Termination of Planned Parenthood from Medicaid.**

49. Following Planned Parenthood's termination from the state's Medicaid program, Planned Parenthood, along with then-co-plaintiff Julie Edwards, filed the initial complaint in this case, challenging the Executive Actions as violating the Medicaid Act and Planned Parenthood's Fourteenth Amendment rights. This Court preliminarily enjoined the termination and later granted summary judgment as to the Free Choice of Provider claim, both rulings that the Fourth Circuit affirmed. *See Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39, 51 (D.S.C. 2018) ("*Baker I*"), *aff'd*, *Baker II*, 941 F.3d 687; *Planned Parenthood S. Atl. v. Baker*, 487 F. Supp. 3d 443, 448–49 (D.S.C. 2020) ("*Baker III*"), *aff'd*, *Planned Parenthood S. Atl. v. Kerr*, 27 F.4th 945, 948 (4th Cir. 2022) ("*Kerr I*"). In affirming summary judgment, the Fourth Circuit found that "South Carolina terminated Planned Parenthood's agreement notwithstanding the fact that all parties agree that Planned Parenthood is perfectly competent to provide the non-abortive healthcare the individual plaintiff sought and requested." *Kerr I*, 27 F.4th at 948. Defendant petitioned for a writ of certiorari on both Fourth Circuit rulings, and the Supreme Court denied the first petition but granted the second petition, vacated the judgment, and remanded the case to the Fourth Circuit for further consideration in light of *Health and Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023). Thereafter, the Fourth Circuit once again reaffirmed this Court's summary judgment ruling. *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 159 (4th Cir. 2024) ("*Kerr II*").

50. Defendant again petitioned for a writ of certiorari. On June 26, 2025, the Supreme Court reversed the decision of the Fourth Circuit, holding that the Free Choice of Provider provision does not clearly and unambiguously confer an individually enforceable right under Section 1983. *Medina*, 145 S. Ct. at 2236. In its decision, the Court recognized that South Carolina's actions specifically and uniquely targeted Planned Parenthood while a "variety of other

nongovernmental entities and governmental agencies" and "private health providers who accept Medicaid" would be allowed to continue providing "access to necessary medical care and important women's health and family planning services." *Id*. at 2227.

### c. Budget Legislation Aimed at Defunding Planned Parenthood

51.    South Carolina has also targeted Planned Parenthood repeatedly and by name through budget-related legislation.  Each year since 2019, the General Assembly has passed an appropriations bill acknowledging that Planned Parenthood is "prevented from performing abortions with state funds," and further directing that "once the federal injunction [entered by this Court] is lifted, [DHHS] may not direct any federal funds to Planned Parenthood."  H.B. 4000, 123rd Session, § 33.25 (S.C. 2019); H.B. 5201, 123rd Session, § 33.25 (S.C. 2020); H.B. 4100, 124th Session, § 33.25 (S.C. 2021); H.B. 5150, 124th Session, § 33.25 (S.C. 2022); H.B. 4300, 125th Session, § 33.25 (S.C. 2023); H.B. 5100, 125th Session, § 33.24 (S.C. 2024); H.B. 4025, 126th Session, § 33.22 (S.C. 2025).

52.    As if identifying "Planned Parenthood" by name in the texts of the appropriations bills were not enough, in his State of the State addresses, Governor McMaster has repeatedly boasted about excluding Planned Parenthood—again identifying the organization by name—from the state budgets he has signed into law.  In 2020, Governor McMaster stated that "[f]or the third year in a row, [his] budget include[d] a proviso preventing the funneling of taxpayer dollars to abortion providers like Planned Parenthood."  He recycled that language the following year, noting his budget included a "provision preventing the funneling of taxpayer dollars to abortion providers like Planned Parenthood" "[f]or the fourth year in a row."  In 2022, he criticized the Biden administration for "challeng[ing] [his] policy of preventing taxpayer dollars from going to abortion

providers like Planned Parenthood."[36]

53.     South Carolina has attempted to pass—and in some cases, succeeded in passing—myriad laws barring state funds from being used for abortion.  *See* S.C. Code Ann. § 44-41-90; H.B. 3774, 125th Session (S.C. 2024); H.B. 3457, 126th Session, § 11 (S.C. 2025).   This legislation belies any claim that, by barring Planned Parenthood from receiving any Medicaid reimbursement, the goal of the Defunding Actions is to prevent public funds from paying for abortions.

### d.  2025 Federal Law Defunding Planned Parenthood

57.     Governor McMaster's zeal for attacking Planned Parenthood through terminating its funding for non-abortion health services is shared by federal lawmakers too.  Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14, Pub. L. No. 119-21, 139 Stat. 72, 300-01 (July 4, 2025), also known as the "One Big Beautiful Bill Act," bars federal Medicaid funds from being "used to make payments" to a "prohibited entity" "for items and services furnished during the 1-year period beginning on the date of the enactment" of the Act.  It defines "prohibited entity" as a 501(c)(3) nonprofit organization, "including its affiliates, subsidiaries, successors, and clinics," that provides non-Hyde Act abortions, "is an essential community provider described in" 45 C.F.R. § 156.235 "that is primarily engaged in family planning services, reproductive health, and related medical care," and that received more than $800,000 in Medicaid reimbursements in federal fiscal year 2023.  Planned Parenthood South Atlantic falls within the definition of "prohibited entity."

58.     PPFA, on behalf of all of its members, including Planned Parenthood South

---

[36] S. Journal, 123rd Leg. Sess. (S.C. Jan. 22, 2020); H.R. Journal, 124th Leg. Sess. (S.C. Jan. 13, 2021); H.R. Journal, 124th Leg. Sess. (S.C. Jan. 19, 2022).

Atlantic, as well as two individual members, promptly sued. The court issued a preliminary injunction enjoining enforcement of the provision as to all PPFA members, including Planned Parenthood South Atlantic. *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, 2025 WL 2101940, at *5 (D. Mass. July 28, 2025). As of the date of this First Amended and Supplemental Complaint, the injunction remains in place. Planned Parenthood continues to see patients enrolled in the South Carolina Medicaid program, as is its normal practice.

## IV.     The Impact of the Defunding Actions on Planned Parenthood and its Patients

59.     Absent declaratory and injunctive relief, the Defunding Actions will have a devastating impact on Planned Parenthood, which plays a crucial role in the South Carolina network of health care providers struggling to meet the needs of their communities, and its patients, who are chronically underserved.

60.     Because DHHS's termination of Planned Parenthood from Medicaid on July 13, 2018 was effective immediately, prior to securing an injunction, Planned Parenthood was forced to call all of its Medicaid patients with upcoming appointments to direct them to seek care elsewhere. The Executive Actions thus already have caused Planned Parenthood and its patients irreparable harm. The Defunding Legislation would have the same effect.

61.     If allowed to go back into effect, Planned Parenthood's Medicaid termination under the Defunding Actions would severely impact its ability to continue providing its Medicaid-insured patients with high-quality and accessible care as it and its predecessors have done in South Carolina for more than 40 years. Critically, Medicaid only covers prescriptions and referrals written by a Medicaid-enrolled provider. If Planned Parenthood's clinicians are no longer Medicaid-enrolled providers, its prescriptions and referrals are effectively useless for patients who rely on Medicaid for insurance. And because Planned Parenthood often does not know ahead of

an appointment whether a patient will need a prescription or referral, absent an injunction, it will have to advise all Medicaid patients ahead of their appointments of the risk that their care will not be covered and to consider seeking care elsewhere. Thus, Planned Parenthood will be forced to end established patient-provider relationships and refer Medicaid beneficiary patients to other health care providers to avoid them having to pay out of pocket for any resulting prescriptions or referred appointments. This would expose Planned Parenthood's Medicaid patients to significant harm and substantially impact Planned Parenthood's mission and reputation with its patients.

62.     As explained, Planned Parenthood's unique model is designed to reduce barriers to care for patients with limited resources—for example, by offering a wide range of primary, preventive, and family planning services, and providing care on a same-day basis, via telehealth, and with interpreting services available. Patients who could no longer use Medicaid as insurance at Planned Parenthood may attempt to seek services with other providers if they can identify any who are qualified and willing to accept them, or they may forgo care altogether. Either way, Planned Parenthood patients, unlike other Medicaid patients, would be denied the right to see their provider of choice. And even those who are able to find another provider may face increased wait times. With reduced or no access to critical health care, including cancer and disease screening and other preventive services, the most vulnerable South Carolinians would face even greater likelihood of suffering from undetected illnesses and poor health outcomes. Every day that this would be allowed to continue, Planned Parenthood and its patients would be irreparably harmed.

63.     Planned Parenthood has earned a reputation as a provider of high-quality health care services and garnered goodwill from patients in part by accepting Medicaid as insurance, thereby living up to its mission of providing high-quality, affordable, and compassionate care regardless of income or insurance status. It has taken decades for Planned Parenthood to build this

reputational capital in South Carolina.  If Planned Parenthood were terminated from Medicaid, including if it were deemed "unqualified" under the Executive Actions, it would suffer immediate, irreparable harm to its reputation as a provider of reliable health care.  The Defunding Actions, if not enjoined, also would frustrate Planned Parenthood's mission to provide high-quality, inclusive, and comprehensive sexual and reproductive health care services to all people—no matter their income, insurance, gender identity, sexual orientation, or race.

64.     Even if Planned Parenthood prevails at the end of this lawsuit, absent emergency relief, some patients will likely not return to Planned Parenthood if the relationship with their established provider is disrupted.  Many of Planned Parenthood's patients develop close and trusting relationships with staff, who have earned a reputation for caring for patients in times of need and offering non-judgmental care related to sensitive issues.  If Planned Parenthood can no longer offer Medicaid-covered services, these relationships will be severely disrupted and Planned Parenthood's reputation undermined, making patients less likely to return.  Planned Parenthood's patients further would suffer from a loss of continuity of care with their established provider.

65.     As of 2023, there were more than 1,000,000 women of reproductive age (ages 15-44) living in South Carolina, 300,000 of whom live in contraceptive deserts within the state, meaning they lack reasonable access in their county to a health center offering the full range of contraceptive methods.  This barrier to contraceptive care places these women at increased risk of a mistimed or unintended pregnancy.  Mission-driven, publicly funded family planning centers like Planned Parenthood in South Carolina helped avert 19,240 unintended pregnancies in 2016, which would have likely resulted in 9,060 unplanned births and 6,510 abortions.[37]  The Defunding

---

[37] Jennifer J. Frost et al., *Publicly Supported Family Planning Services in the United States: Likely Need, Availability and Impact, 2016*, 39 tbl. 14, Guttmacher Inst. (Oct. 2019),

Actions place these and other non-abortion services Planned Parenthood provides in jeopardy, irreparably harming Planned Parenthood's patients and its pursuit of its mission to expand access to reproductive health care.

66.     Data from states that have attempted to prevent PPFA members from receiving government funding confirm that the risk of irreparable harm to providers and patients from the Defunding Actions is real and significant.[38]  For example, in 2013, Texas wrongfully excluded PPFA member health centers from its state family planning program, called the Women's Health Program.  Within two years, nearly 30,000 fewer patients received birth control, cancer screenings, and other preventive care through the Women's Health Program.  Within five years, 41% fewer women received contraceptive care through the program.  From 2011 to 2014, unintended pregnancy increased and Medicaid-financed births increased by 27% because fewer women were getting birth control counseling and services.

67.     Similarly, after Iowa excluded abortion providers from its state family planning program, there was an 86% decline in provision of services, and Iowa's public health officials reported a spike in cases of gonorrhea, chlamydia, and syphilis.

68.     After the Kansas legislature blocked its residents' ability to obtain care at the PPFA member serving the state through the Title X program,[39] the state experienced a more than 37%

---

https://www.guttmacher.org/sites/default/files/report_pdf/publicly-supported-fp-services-us-2016.pdf.

[38] *See* Expert Decl. of Claire D. Brindis in Supp. of Pls.' Emer. Mot. for a TRO and Prelim. Inj. at 31–55, *Planned Parenthood Fed'n of Am., Inc., v. Kennedy*, 2025 WL 2101940 (D. Mass. July 28, 2025) (No. 1:25-cv-11913-IT), Dkt. No. 5-5; *The Harm of Defunding Planned Parenthood Health Centers*, Planned Parenthood (Apr. 2025), https://www.plannedparenthood.org/uploads/filer_public/60/22/6022aa2f-caed-4946-966f-7186b9751e3c/defunding_state_cases_20_pdf.pdf.

[39] Title X is the nation's only federally-funded program dedicated to providing preventive sexual and reproductive health care to people with low incomes.

decline in the number of annual pelvic exams, birth control, cancer screenings, STI testing, and other care obtained through its Title X family planning program.

69.    Iowa saw an 86% decline in the provision of reproductive healthcare services within two years of the state's decision to forgo federal funding through the Medicaid family planning waiver program that would have enabled state residents to receive care from the PPFA member there.

70.    In Tennessee, a Title X defund caused family planning services in one county to drop by 93%.

71.    And in Indiana, within two years of a PPFA member health center closing its doors due to a state law that barred that member from receiving STI prevention program funding from the Centers for Disease Control and Prevention, the county experienced an unprecedented HIV outbreak that the then-governor deemed a public health emergency.  Not coincidentally, the PPFA member health center that closed was the only provider in the community that provided HIV testing and education.

72.    Health experts likewise agree that if patients lose access to health care services or are delayed in accessing health care services that they currently obtain at Planned Parenthood, the public health consequences will be numerous and severe.  These adverse consequences are likely to include, among others, unintended and riskier pregnancies, potentially resulting in health problems for women and their children; higher rates of STIs and more severe consequences for patients experiencing these diseases; and reduced access to cancer screenings.

73.    Planned Parenthood has no adequate remedy at law.

## CLAIMS FOR RELIEF

## CLAIM I – FOURTEENTH AMENDMENT EQUAL PROTECTION

### (The Defunding Actions)

74.     Plaintiff hereby incorporates Paragraphs 1 through 73 above.

75.     The Executive Actions and Defunding Legislation each violate Planned Parenthood's Fourteenth Amendment rights by singling out Planned Parenthood for unfavorable treatment absent adequate justification.  Entities like Planned Parenthood, in addition to natural persons, are entitled to raise Equal Protection claims.  *See Alive Church of the Nazarene, Inc. v. Prince William County*, 59 F.4th 92, 112 (4th Cir. 2023); *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 327 (M.D.N.C. 2012).

76.     The Executive Actions and Defunding Legislation each arbitrarily treat Planned Parenthood unlike other health care providers that provide abortion and receive Medicaid reimbursements.  *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

77.     Neither the Executive Actions nor the Defunding Legislation is rationally related to a legitimate government interest.  *See Romer v. Evans*, 517 U.S. 620, 633, 660 (1996).  The Defunding Actions are based in animus towards Planned Parenthood because Planned Parenthood provides abortions, which it does wholly outside of the Medicaid program.  At the same time, other abortion providers in South Carolina—specifically, certain hospitals—may continue to receive Medicaid reimbursements even though Planned Parenthood cannot.  That abortion is legal in South Carolina until detection of the "fetal heartbeat," and in extremely limited circumstances thereafter underscores the arbitrary nature of the Defunding Actions.  And other provisions of South Carolina law already prohibit state funds from paying for abortion.

78.     Further, the Executive Actions and Defunding Legislation each arbitrarily treat

Medicaid beneficiaries whose provider of choice is Planned Parenthood differently than Medicaid beneficiaries whose provider of choice is another Medicaid-enrolled provider that also provides abortions, even though both groups seek Medicaid-eligible care from providers that, but for the Defunding Actions, have been deemed qualified and willing to provide that care.

## CLAIM II – BILL OF ATTAINDER

### (The Defunding Legislation)

79.     Plaintiff hereby incorporates Paragraphs 1 through 78 above.

80.     The U.S. Constitution prohibits states from passing bills of attainder.  *See* U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder[.]").

81.     The Defunding Legislation constitutes an unconstitutional bill of attainder because each specifically identifies by name and punishes Planned Parenthood without a judicial trial. Specifically, the Defunding Legislation prohibits DHHS from "direct[ing] any federal funds to Planned Parenthood."  The history and context of the Defunding Legislation demonstrates that the intent of these legislative acts is to punish Planned Parenthood by making it ineligible for Medicaid reimbursement.

## CLAIM III – FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS

### (The Executive Actions)

82.     Plaintiff hereby incorporates Paragraphs 1 through 81 above.

83.     The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

84.     Planned Parenthood has a constitutionally protected property interest in continued participation in the Medicaid program, for which it is eligible and received funding prior to the

Defunding Actions.  A health care provider's "expectation of continued participation in [federal healthcare] program[s] is a property interest protected by the due process clause[.]"  *Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir. 1986).  Planned Parenthood and its predecessor organizations have provided health care in South Carolina through the Medicaid program for over 40 years. Planned Parenthood complied with applicable laws and regulations during its years of enrollment, including the restriction on Medicaid reimbursement for abortion, and expects to continue to participate in Medicaid as a provider.

85.     Planned Parenthood was entitled to adequate notice and a pre-deprivation hearing prior to its termination from South Carolina's Medicaid program.  *Bowens v. N.C. Dep't of Hum. Res.*, 710 F.2d 1015, 1019-20 (4th Cir. 1983).  It has a significant interest in continued participation in the Medicaid program, there is great risk of erroneous deprivation of this interest given the lack of procedures used, and Defendant has no governmental interest in Planned Parenthood's termination from Medicaid.  Indeed, South Carolina still would fund Medicaid-covered services from other providers, including other abortion providers, if Planned Parenthood were terminated from Medicaid.

86.     The risk of harm in terminating Planned Parenthood from Medicaid without procedural safeguards is significant.  Planned Parenthood would be forced to tell patients that they may no longer be able to use Medicaid to pay for their care and may need to attempt to obtain care elsewhere.  Many of Planned Parenthood's patients would be left without sufficient time—let alone the resources—to identify another provider to fill this gap in care.  In such situations, the Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."  *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

87.     The Executive Actions deprive Planned Parenthood of its constitutionally protected

property interest. DHHS terminated Planned Parenthood's "enrollment agreements with the South Carolina Medicaid Program . . . effective" the same date that Governor McMaster signed his Executive Order and DHHS notified Planned Parenthood it was subject to termination. Planned Parenthood thus was terminated with virtually no notice and no process in connection with the deprivation of its interest.

88.     The Defunding Legislation, by its very terms, each takes effect only "once the federal injunction [entered by this Court] is lifted." The Executive Actions should be enjoined, rendering the Defunding Legislation unenforceable.

<b>RELIEF REQUESTED</b>

WHEREFORE, Plaintiff requests that this Court:

89.     Issue a declaratory judgment that the Executive Actions and Defunding Legislation each violate the Equal Protection Clause of the Fourteenth Amendment;

90.     Issue a declaratory judgment that the Defunding Legislation each constitutes an unconstitutional bill of attainder;

91.     Issue a declaratory judgment that the Executive Actions violate Planned Parenthood's due process rights under the U.S. Constitution;

92.     Issue a declaratory judgment that the Defunding Actions are not lawful or proper bases for terminating Planned Parenthood from the South Carolina Medicaid program;

93.     Issue temporary preliminary, and permanent injunctive relief, without bond, enjoining Defendant and her agents, employees, appointees, delegates, successors, and anyone acting in concert or participation with Defendant from terminating, or threatening to terminate, Planned Parenthood from South Carolina's Medicaid program, or otherwise enforcing or applying, or threatening to enforce or apply, the Defunding Actions even if the injunction is later reversed,

or for seeking and retaining Medicaid reimbursement for such services;

94.     Order Defendant, her agents, employees, appointees, successors, and anyone acting in concert or participation with Defendant to take all steps necessary to ensure that Medicaid reimbursements continue to be disbursed to Planned Parenthood in the customary manner and timeframes, including reimbursements for services provided while an injunction is in place;

95.     Retain jurisdiction after judgment for the purpose of resolving any future disputes over the effect of any injunctive relief this Court may issue, including if injunctive relief is granted and later reversed;

96.     Grant Plaintiff attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and,

97.     Grant such further relief as this Court deems just and proper.

Dated: August 21, 2025                    Respectfully submitted,


By: /s/ Kathleen McDaniel
    M. Malissa Burnette (Fed. Bar No. 1616)
    Kathleen McDaniel (Fed. Bar No. 10139)
    Grant Burnette LeFever (Fed. Bar No. 12943)
    Burnette Shutt & McDaniel, PA
    912 Lady Street, Second Floor
    Columbia, SC 29201
    803-904-7913
    mburnette@burnetteshutt.law
    kmcdaniel@burnetteshutt.law
    glefever@burnetteshutt.law

    Jennifer R. Sandman*
    C. Peyton Humphreville**
    Planned Parenthood Federation of America
    123 William Street, Ninth Floor
    New York, NY 10038
    212-541-7800
    jennifer.sandman@ppfa.org
    peyton.humphreville@ppfa.org

    Hannah Swanson**
    Planned Parenthood Federation of America
    1110 Vermont Avenue NW, Suite 300
    Washington, DC 20005
    202-494-8764
    hannah.swanson@ppfa.org

    Heather L. Richardson**
    Priyah Kaul**
    Gibson, Dunn & Crutcher LLP
    333 South Grand Avenue
    Los Angeles, CA 90071
    213-229-7000
    hrichardson@gibsondunn.com
    pkaul@gibsondunn.com

    *Attorneys for Plaintiff*

    * Admitted pro hac vice
    ** Pro hac vice application forthcoming